UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

| | | |
|---|---|---|
| 725 EATERY CORP., etc., *et ano.,* | : | |
| Plaintiffs, | : | |
| - against - | : | Civil Action No. 02 CV 4431 (LJL) |
| THE CITY OF NEW YORK, et al., | : | |
| Defendants. | : | |

----------------------------------------------------------------X

| | | |
|---|---|---|
| 59 MURRAY ENTERPRISES INC., etc., *et al.,* | : | |
| Plaintiffs, | : | |
| - against - | : | Civil Action No. 02 CV 4432 (LJL) |
| THE CITY OF NEW YORK, et al., | : | |
| Defendants. | : | |

----------------------------------------------------------------X

| | | |
|---|---|---|
| CLUB AT 60TH STREET, INC., etc., *et al.,* | : | |
| Plaintiffs, | : | |
| - against - | : | Civil Action No. 02 CV 8333 (LJL) |
| THE CITY OF NEW YORK, | : | |
| Defendant. | : | |

----------------------------------------------------------------X

**DECLARATION OF ANTHONY D'AMICO IN SUPPORT OF
<u>PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT</u>**

**ANTHONY D'AMICO,** hereby declares the following pursuant to 28 USC §1746:

1. My legal name is Anthony D'Amico and I have personal knowledge of the facts stated herein.

2. I submit this declaration on behalf of plaintiff JNS Ventures Ltd. d/b/a "Vixen," to supplement my Declaration dated November 12, 2018, filed November 21, 2018, as set forth as Exhibit I in Volume 4 (appearing at pages 0283-0296) of Plaintiffs' Joint Appendix filed in this and the companion actions on November 18, 2018 ("Prior Declaration"), and in support of plaintiffs' current motions for partial summary judgment.

3. I have reviewed and confirm in all respects the accuracy of my Prior Declaration as of the date thereof and as of the date hereof, and respectfully supplement it for purposes of Plaintiff's Motions as follows:

4. I was and am the President of the plaintiff corporation.

5. With the exception of the period of time during which the businesses was closed due to the Pandemic, Vixen has continuously operated by regularly presenting adult performances since (a) prior to the adoption of the 2001 Amendments, and (b) the time of the Prior Declaration.

6. If the 2001 Amendments are permitted to take effect and be enforced, and plaintiff is compelled to move from its present business location in order to comply therewith, it continues to be Declarant's desire to relocate, but for the reasons stated in my

Prior Declaration, our club would be unwilling and unable to do so under the regulatory scheme being challenged.

7. I have also read and am familiar with the Declaration of Michael Berzak, filed herewith ("Berzak Declaration"). For the reasons set forth in the Berzak Declaration, unless and until the deficiencies in the vesting provisions of the Zoning Resolution are remedied, we would not attempt to open a *new* 100% club at any location not already licensed for adult use.

I hereby declare the preceding statements to be true and correct under the penalty of perjury.

Executed in the United States of America, at Ridgewood, New York, on the 14th day of September, 2022.

_____
Anthony D'Amico

**2018 D'Amico Declaration**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

59 MURRAY ENTERPRISES, INC. a/k/a
59 MURRAY CORP., d/b/a "New York Dolls",
AAM HOLDING CORP. d/b/a "Private
Eyes", WEST 20TH ENTERPRISES CORP. d/b/a
"VIP Club New York", and JNS VENTURES
LTD. d/b/a "Vixen",

                  Plaintiffs,

    - against -

THE CITY OF NEW YORK; BILL DE BLASIO,
as Mayor of the City of New York; and RICK D.
CHANDLER, as Commissioner of Buildings of
The City of New York,

                  Defendants.

------------------------------------------------------------X

Civil Action No.
02 CV 4432 (WHP)

### DECLARATION OF ANTHONY D'AMICO IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

     **ANTHONY D'AMICO**, hereby declares the following pursuant to 28 USC §1746:

     1.    My legal name is Anthony D'Amico and I have personal knowledge of the facts stated herein.

0283

2. I submit this declaration on behalf of plaintiffs JNS Ventures, Ltd. d/b/a "Vixen."

3. Vixen (previously known "Treasure Chest") has been doing business at premises 60-07 Metropolitan Avenue, Ridgewood, New York ("Building") since approximately 1993. Since March, 1997, I have been the sole shareholder in the corporation. As a result, I have personal knowledge of the configuration and operation of Vixen throughout this entire period.

4. At all times since 1993, the Building has been and currently is a small, 1-story building located in the Ridgewood area of Queens, on Metropolitan Avenue, between Elliot Avenue and 60th Street, and Vixen has been and currently is the sole tenant and occupant of the Building.

5. At all times since 1993, the Building has been and currently is located within a C2-4 (within an R-6B) zoning district and within five hundred feet (500') of property used as of right for residential purposes.

6. Before the 60/40 requirements took effect in 1998, Vixen featured live dance entertainment throughout the occupied portion of the Building, such that the business was an "adult eating and drinking establishment" as then defined by AZR 12-10

0284

as amended by the 1995 "adult use" amendments to the New York City Zoning Resolution (the "1995 Ordinance").

7. Beginning in 1998, concurrent with the enforcement of the 1995 Ordinance, Vixen renovated its business premises so that such "adult entertainment" was featured and could be observed by patrons in less than forty percent (40%) of its customer accessible space.

8. This renovation was achieved by re-furbishing the existing westerly portion of the Building (which houses more than sixty percent (60%) of the customer-accessible space), and legalizing it for use as a liquor-licensed cabaret lounge with live music, featuring local jazz artists and musical groups and karaoke nights, and as a venue for birthdays, baby showers, bar mitzvahs, retirement parties, and similar parties and occasions, at a cost of approximately $10,000.

9. The purpose of this re-furbishment was to conform to the spatial requirements of the 1995 Ordinance, such that Vixen would not be classified as an "adult establishment" and would not have to re-locate in order to continue its business.

10. The internal configuration of Vixen has not been materially altered since 1998, consists of 2,700 square feet of space, and continues through the present to feature its adult entertainment in less than forty percent (40%) of its customer accessible space.

0285

11. Shortly thereafter, Vixen installed new "subdued" exterior signage in order to conform to the signage requirements of the 1995 Ordinance, at a cost of approximately $3,000.

12. At the present time, Vixen employs in excess of 100 individuals as managers, bartenders, hosts/hostesses, wait staff, janitors, security personnel, and performers.

13. Vixen's present lease of its space runs to January 1, 2020.

14. I am advised by legal counsel and believe that the 2001 Amendments to the 1995 Ordinance changed the definition of an adult establishment for zoning purposes, such that regularly featuring "adult entertainment" (as defined by the 1995 Ordinance) in "any portion" of Vixen's space will, for the first time, bring it within the definition of an "adult establishment" for zoning purposes and, given its location in a C-2 zone and proximity to sensitive receptors (residences as of right), will require it to re-locate in order to continue to offer "adult entertainment" on their business premises.

15. In that event, it would certainly be my desire to re-locate Vixen and continue to operate the business. However, I am unwilling and unable to do so because of the reasons set forth in Exhibit A hereto, which I have read and believe to be true and correct in all respects as concerns Vixen.

0286

16. Furthermore, if I was required to re-locate in order to remain in business, I would have to find a properly zoned location that would comply with the current Administrative Code and regulatory requirements, including handicap accessibility, public assembly and fire code requirements. Moreover, in order to realistically conduct business, I would require a <u>minimum</u> of (a) approximately 1,000 square feet for a coat room, cashier, office, storage of liquor, equipment and supplies, dressing room, and toilets, and (b) approximately 2,500 square feet of space for one or more bars, one or more stages, and main and VIP customer seating areas. It is my understanding, based upon inquiry of local real estate brokers and others in our industry, that no such locations are currently available, and that it is likely that it would take a year or more in order to find and convert one for use as an adult cabaret.

17. Given all of these facts and circumstances, I am advised by legal counsel and believe that Plaintiffs should be granted a preliminary injunction against enforcement of the 2001 Amendments and related provisions of the Amended Zoning Resolution.

**WHEREFORE,** I urge the Court to grant Plaintiffs' motion for a preliminary injunction, together with such other, further and different relief as is just, necessary and proper.

0287

I hereby declare the preceding statements to be true and correct under the penalty of perjury.

Executed in the United States of America, at New York,
New York, on the 12 day of November, 2018.

*Anthony D'Amico*
Anthony D'Amico

6

0288

## Exhibit A to D'Amico Declaration
## Reasons Precluding Relocation of 60/40 Adult Uses

I.     **Zoning Restrictions**

A. In order to leave the business's current location and relocate to a new location, the business must first locate a site that meets the City's zoning requirements.

B. I am not adept at the legalities of the zoning and building code. I would need expert assistance, including at a minimum, lawyers, real estate brokers and architects, to help me find a legally permissible and suitable relocation site. This expert assistance would likely be costly and time-consuming.

C. I have made a preliminary investigation, through lawyers and land use experts, into legally and commercially available sites in Manhattan and have been unable to locate any such sites in Manhattan.

D. I am also aware that the City has made several changes to the zoning in areas throughout the City since enactment of the 2001 amendments and that a great deal of land which used to be legally permissible for adult businesses is now prohibited.

E. I am also aware that the City requires any lawful adult business which becomes nonconforming due to one of these zoning amendments to terminate within one year after the City makes any such zoning change.

0289

F. This means that, even if my business were to relocate to a site that today conforms with the City's zoning restriction, the City could subsequently change the zoning of the site and render it nonconforming. The City could also change the zoning of any areas within 500 feet of my relocation site to one of the numerous districts which prohibit adult uses, which could also make my relocation site nonconforming. As a result, even if I were to relocate my business, I could be required to close it within a year of any zoning change. This shifting zoning landscape makes me very reluctant to invest the time, money, resources, marketing, and energy it would take to move my business from its current location to an entirely new location.

G. Given the possibility that the City could change the zoning of such a site before it even opened, and certainly long before it made enough income to offset the very substantial startup costs and justify the risk of entering into an expensive long term lease, it simply would make no commercial sense to attempt to relocate so long as the City continues to require the termination of adult businesses, and no others, within a year after they become nonconforming.

## II. Permitting Problems

A. In my experience including what I've been advised, it would take *substantially* more than a year to relocate my business from its existing location to a new location.

0290

B. After finding a suitable, available, and legally permissible site, I would then have to negotiate the terms of a lease with the landlord and/or obtain financing to purchase the property outright. This process would be complicated by the fact that all other displaced 60/40 adult uses would be competing for the same small number of available relocation sites.

C. Assuming I was able to secure the property, I would then be required to seek a variety of building and zoning approval permits, depending on the property's prior usage. Because I am not savvy at navigating the City's building and zoning requirements, I would need additional expert assistance with this process. This would be costly and time-consuming, and especially so because adult uses are not permitted to self-certify the plans for their building permit applications.

D. Zoning approval is part of the building permit process. Based on my experience as an adult business owner in New York City, I understand that just obtaining zoning approval for adult uses routinely takes many months, and in some instances well over a year.

E Upon receiving zoning approval, I would also need to hire architects and engineers, at great cost to me, to prepare the detailed building permit plans that are required to comply with the City's building code provisions. This, as well, would be not only expensive, but add substantial additional time to the startup process.

F.      Once building permits finally issued, I would commence the process of construction and seeking a temporary, and ultimately permanent, certificate of occupancy. This would add very substantial additional time to the overall time necessary to relocate and open.

G.      In addition, it is my understanding that any new premises would have to qualify for permitting by the Department of Buildings and New York City Fire Department as a "place of assembly." This would require a Certificate of Occupancy permitting the use, as well as compliance with all of the myriad Occupancy Group F-4 (as to premises subject to the 1968 Building Code) or Assembly Group A-2 (as to premises subject to the 2014 Building Code) rules and regulations concerning ingress and egress, sprinklers, fire alarms, and the like, a Place of Assembly Certificate of Operation, and an approved Place of Assembly Plan (subject to a separate Building Department examination). These requirements are summarized in the Building Department's published Code Notes for Place of Assembly PA Applications (http://www1.nyc.gov/assets/buildings/pdf/code_notes_place-of-assembly.pdf). While existing places of assembly would qualify, other commercial spaces typically would not without substantial, time-consuming, and expensive alterations subject to the Building Department processes of plan examination, approval, permitting, and inspection. Although, as I understand it, applications for places of assembly permits are generally

10

filed during the building permit or construction phase, they cannot be actually *issued* until after the temporary certificate of occupancy is granted, and the process of actual issuance of the assembly permit can add substantial additional time to the entire project.

      H.    In addition, even if I am successful in finding a lawful and commercially available relocation site and obtaining all the necessary permits and inspections, I still would have to meet the separate "siting" standards of the Alcoholic Beverage Control ("ABC") Law and the Rules of the State Liquor Authority ("SLA") in order to continue selling liquor, which is an essential component of my business. As premises licensed by the SLA to sell liquor "on premises," my business cannot be operated at another location without the permission of the SLA, which requires that any business locations comply with local law [see SLA Rule 48.3] *and* satisfy the "public interest and convenience" criteria [see ABC Law, §§ 64-(7)(b) and (f) ("License to sell liquor at retail for consumption on the premises")] when there are more existing premises licensed within five hundred feet of a proposed new business to be licensed. Upon the advice of counsel, and based upon my own knowledge as an experienced consultant, manager, and operator of licensed premises, if otherwise suitable locations could be found, they would require a discretionary approval by the SLA that the grant of the license would be "in the public interest" if located within 500 feet of three other on-premises liquor-licensed premises (regardless of any consideration of "adult") [see ABC Law §64-(7)(f)], and no license

11

could be issued prior to review by and consultation with the local Community Board [see ABC Law § 64-(7)(f)]. In short, the requirement of SLA approval of any location would considerably complicate, and potentially substantially delay, the process of re-locating and opening my business.

I. Yet another problem that would deter me from attempting to relocate to a new site not previously zoned for an adult use, is what I've heard described as the "sensitive use veto" problem. My attorneys have explained, and based on my experience as an operator of adult businesses in the City I have come to understand, that while a building permit application for an adult business is pending – as part of the business' efforts to obtain city confirmation that it is lawfully located and secure prioritization of its location against any new disqualifying businesses coming in and knocking out the adult business – if the disqualifying new business gets its permit first, then the adult business will be disqualified, even if it filed its permit application way before the disqualifying new business. If this weren't bad enough, my attorneys have advised me that non-adult businesses can get their permits granted much faster than an adult business.

J. As an example, I have heard of one situation where an adult business, in what was literally an 11th hour attempt to stop a competitor's new adult business, conspired with a local church to convert church-owned office and storage space near the new club's site into worship space in an attempt to disqualify the site and keep the new

club from operating. Fortunately, the competitor-sponsored church started its efforts too late in the process, so its attempt failed, and the new club prevailed. Nonetheless, the church's efforts caused the DOB to institute proceedings to revoke the new club's permits which went on for approximately two years until the DOB finally ruled for the new club. Had the blocking process started a bit earlier, the church might well have prevailed and succeeded in disqualifying the new club's site, even though the club had in good faith filed its permit applications way earlier and had spent millions of dollars on its lease, architecture and design fees and other related costs.

### III.  Chilling Effect of the Above

Based on all of the above, and based upon my knowledge of the New York City adult business industry, I believe it would be impossible to relocate and open in less than a year and would likely take at least as much as several years to do so.

As a result of each of the above-described problems, risks and costs facing an adult club attempting to relocate, if the 2001 Amendments are enforced and I were forced to close my existing business(es) and, because there is no realistic option for relocation, I

0295

believe it is highly likely that I would not attempt to relocate my business(es) but would simply close it (them).

Executed in the United States of America, at New York,
New York, on the 12 day of November, 2018.

*Anthony D'Amico*
Anthony D'Amico

14

0296